## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD HILES,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **CIVIL ACTION NO. 3:13-1798** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** | : | **(JUDGE MANNION)** |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

### Introduction

Plaintiff Edward Hiles has filed this action pursuant to 42 U.S.C. §405(g) seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his claim for social security disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured." Hiles met the insured status requirements of the Social Security Act through December 31, 2015. Tr. 14.[1] Therefore, to be entitled to disability insurance benefits, Hiles must establish that he suffered from a disability on or before that date. 42 U.S.C. §423(a)(1)(A).

Hiles protectively filed his applications for social security disability insurance benefits and supplemental security income benefits on August 24,

---

[1]References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

2010 and December 29, 2010, respectively, with an amended date of disability of February 14, 2011. Tr. 12. Hiles has been diagnosed with migraines, right shoulder subacromial impingement status post tendon tear repair, degenerative disc disease of the lumbar and cervical spine, intermittent vertigo, carpal tunnel syndrome status post release, posttraumatic stress disorder ("PTSD"), major depressive disorder, and personality disorder. Tr. 14-15. On January 12, 2011, Hiles' applications were denied by the Bureau of Disability Determination. Tr. 33, 39.

On February 25, 2011, Hiles requested a hearing before an administrative law judge ("ALJ"). Tr. 30. The ALJ conducted a hearing on April 30, 2012, where Hiles was represented by an attorney. Tr. 878-922. On June 5, 2012, the ALJ issued a decision denying Hiles' applications. Tr. 12-23. On April 30, 2013, the Appeals Council declined to grant review. Tr. 5. Hiles subsequently filed a complaint before this Court on July 1, 2013, and this case became ripe for disposition on February 20, 2014, when Hiles filed a reply brief.

Hiles appeals the ALJ's decision on three grounds: (1) the residual functional capacity determination was not based on substantial evidence, (2) the ALJ erred in her evaluation of the available medical opinion evidence, and (3) the ALJ erred in her determination at Step Three. For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Hiles was forty years of age at the time of the ALJ's decision; he has a high school education and is able to read, write, speak, and understand the English language. Tr. 21, 137. Hiles' past relevant work includes work as a kitchen helper, which is classified as medium, unskilled work, and as a warehouse worker, which is also medium, unskilled work. Tr. 918-19.

### A.    Hiles' Headaches and Vertigo

Hiles began experiencing symptoms of vertigo as early as May 15, 2007, well prior to the relevant period. Tr. 290-91. MRA and MRI scans were performed on his brain that same day, with neither revealing any significant abnormalities. Tr. 292. Hiles continued presenting to his treating physicians at Myerstown Family Practice throughout 2009 with complaints of continuing vertigo. Tr. 298-99, 322-225, 327-28. His treating physicians diagnosed him with "vertigo benign paroxysmal position."[2] Tr. 322. An October 14, 2009 MRI of the brain revealed sinus and mastoid inflammatory disease, but was otherwise grossly negative. Tr. 326.

On November 2, 2009, Hiles reported to his treating physician that he

---

[2]This condition causes "the sudden sensation that you're spinning or that the inside of your head is spinning. Benign paroxysmal positions vertigo is characterized by brief episode of mild to intense dizziness." Mayoclinic.org, Benign Paroxysmal Positional Vertigo Definition, available at http://www.mayoclinic.org/diseases-conditions/vertigo/basics/definition/con-20028216 (last visited October 22, 2014).

was "doing fantastically well as he had . . . right ear tube replace[ment] per Dr. Masaros and now the vertigo is essentially much better." Tr. 329. It was noted that Hiles' vertigo was "resolved after the ear tube replaced." Id. However, at a December 8, 2009 neurological consultation with David Gill, M.D., Hiles reported that his vertigo had returned. Tr. 372. Dr. Gill noted that Hiles "did have a tube placed in his right tympanic membrane mid to end of October, which gave him 4 to 5 days of complete relief of his vertigo." Id. Hiles reported many near falls and stated that Meclizine helped with the vertigo, but caused tiredness. Id. A physical and neurological examination was normal. Tr. 373. Hiles also reported migraines accompanied by nausea and vomiting, although he noted that "ibuprofen and promethazine are quite helpful at relieving them after a few hours." Id.

During a January 4, 2010 appointment with Dr. Mesaros, Hiles reported that he was still experiencing symptoms of vertigo, particularly when he turned his head. Tr. 352. On March 1, 2011, Hiles returned to Dr. Mesaros with continued vertigo. Tr. 471. An MRI did not suggest any abnormality or mass lesion, and an ENG did not reveal any inner ear pathology. Id. Dr. Masaros opined the he was "a little stumped [as to] why [Hiles] has had persistent vertigo." Id.

On March 28, 2011, Hiles presented to Jonas Sheehan, M.D. and David Black, PA-C with complaints of persistent vertigo. Tr. 601. Dr. Sheehan noted that Hiles had twelve reconstructive surgeries on his right ear, and opined that

4

"it is most likely that he is having sequelae from his surgeries causing his vertigo problem." Id. Hiles continued seeking treatment for his vertigo from Myerstown Family Practice through October 2011. Tr. 441-50, 505-06.

Hiles also frequently complained of headaches beginning as early as 2009. Tr. 322. Throughout 2009 and 2010, Hiles told his treating physicians that his headaches were somewhat controlled by medication. Tr. 322, 324, 329, 335, 338, 341, 345. By early 2011, Hiles was continuing to experience headaches, with only some relief provided by ibuprofen and other over-the-counter medications. Tr. 438, 505.

On April 28, 2011, Hiles was examined by Virginia Thompson, CRNP for a pain management consultation. Tr. 545-48. Hiles complained of ongoing headaches ranging from a three out of ten pain at their best, to ten out of ten pain at their worst. Tr. 545. He stated that Aleve was "quite helpful for him" and declined occipital nerve blocks. Tr. 547. Ms. Thompson noted "significant tenderness to palpation, most notably over the right occipital area, which recreated [Hiles'] usual headache[.]" Tr. 546. Otherwise, Hiles' physical examination was normal and Ms. Thompson did not prescribe any medication. Tr. 546-47.

On July 20, 2011, Hiles was examined by Evan Freeman, D.O. Tr. 542. Hiles stated that he continued to experience headaches once to twice per day, for approximately three or four days each week. Id. These headaches were generally preceded by vertigo and accompanied by sensitivity to light

and sound. Id. When he experienced headaches, Hiles would take an ibuprofen and lie down; after one hour he would feel better. Id. A physical inspection was normal, and Dr. Freeman opined that Hiles' pain was likely related to migraine headaches. Tr. 543.

On August 4, 2011, Hiles returned to Dr. Gill with continuing headaches. Tr. 579. Hiles reported that ibuprofen provided "mild-to-moderate" relief for his headaches, but did not relieve them completely. Id. Physical, neurological, and sensory examinations were normal. Tr. 580. Dr. Gill prescribed an abortive medication, Tompamax, to alleviate Hiles' migraine headaches. Tr. 582.

### B.    Hiles' Mental Impairments

Throughout the relevant period, Hiles was prescribed psychiatric medications by his treating physicians at Myerstown Family Practice. Tr. 438-39, 441-43. Hiles generally complained of depression, PTSD, stress, and relationship issues. Id. Hiles declined to see a psychiatrist because he could not afford such treatment, but reported feeling "somewhat" better with Effexor. Tr. 439, 443.

On February 14, 2011, Hiles underwent a clinical assessment with a therapist. Tr. 479-84. Hiles was depressed and anxious with a restricted range of affect. Tr. 483. He was cooperative, had normal speech, a clear and coherent thought process, and demonstrated fair impulse control and good

6

insight. Id. Hiles was assigned a GAF score of 42.[3] Tr. 484.

On August 18, 2011, Hiles presented to Anne Dall, M.D. for an initial psychiatric evaluation. Tr. 474-76. Dr. Dall noted that Hiles' "medications are helping somewhat, but he still describes a lot of ongoing symptoms." Tr. 474. Hiles described difficulty focusing and concentrating, and reported flashbacks, explosive mood, poor sleep, anhedonia, feelings of guilt, impaired energy, a loss of interests and motivation, irritability, and anxiety. Id. Hiles was cooperative with a constricted affect and had no psychomotor agitation or retardation. Tr. 475. He had normal speech, his thought processes were organized, clear, coherent, and goal directed, and he denied hallucinations or delusions. Id.

Dr. Dall opined that Hiles' immediate and short term memory were intact to register. Id. Hiles was able to recall three out of three words after one minute and after five minutes. Id. His remote memory was good, and he was able to interpret abstract proverbs. Id. Hiles' judgment was intact, but his impulse control was limited and his insight was only fair. Id. Dr. Dall diagnosed Hiles with PTSD, major depressive disorder, and "rule out ADHD."

---

[3]A GAF score of 41-50 is indicative of "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

Tr. 476. Hiles was assigned a GAF score of 55.[4] Id.

On September 21, 2011, Hiles complained of general restlessness, difficulty concentrating, and impulsivity. Tr. 454. However, he noted that "medication changes have improved his overall functioning." Id. Dr. Dall assigned a GAF score of 56. Id. On October 19, 2011, Dr. Dall opined that Hiles was "taking some goods steps in handling his life." Tr. 452. Hiles' mental status remained largely unchanged, and he was assigned a GAF score of 57. Id.

Hiles continued to receive monthly treatment with Dr. Dall through April 2012. Tr. 757-68. He continued to report anxiety, depression, stress, and symptoms related to PTSD. Id. Hiles' mood and affect were variable, but he consistently had good eye contact, intact cognition, and no psychotic symptoms. Tr. 763-68. Dr. Dall consistently noted that Hiles had normal concentration, normal speech, appropriate manners, logical thought process, intact thought associations, and no impairment in thought content. Tr. 757-62. His insight and judgment were good, his decision making capacity was intact, his memory was intact, and he had no psychotic symptoms. Id. Dr. Dall assigned GAF scores at every appointment ranging from 55 to 57. Tr. 757-68.

---

[4]GAF scores between 51 and 60 indicate "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

## C.    Residual Functional Capacity Assessments

On December 28, 2010, Louis Laguna, Ph.D. examined Hiles and completed a mental residual functional capacity assessment. Tr. 394-402. Hiles reported being disabled due to PTSD and ADHD, though he had never been hospitalized for these impairments. Tr. 398. Hiles reported often fighting as a child, but Dr. Laguna noted that the reports "were grossly exaggerated to the point that I questioned if they even occurred." Tr. 399. Hiles also reported doing well in his criminal justice classes that he was taking at the Harrisburg Area Community College. Id.

Hiles was cooperative with normal speech, though he reported having trouble concentrating. Tr. 400. His thought processes, productivity, continuity, and language were all intact. Id. Hiles was able to think abstractly, as evidence by his ability to interpret simple proverbs. Id. He had a good capacity for calculating serial 3's, good general knowledge, and "well intact" recent, recent past, and remote memory. Id. Hiles did have poor judgment and some impulse control issues. Tr. 400-01. Dr. Laguna noted that it did not appear that "there is a general impairment due to any type of attentional deficit or hyperactivity." Tr. 400. Furthermore, though Dr. Laguna assessed for depression and anxiety, Hiles denied any symptoms of either depression or anxiety. Id.

Dr. Laguna diagnosed Hiles with personality disorder, NOS, and "rule out ADHD." Tr. 401. Dr. Laguna elected not to diagnose Hiles with PTSD,

9

despite this being Hiles' primary complaint, and noted that Hiles "limited his description of having PTSD to bad dreams about his mother's abuse" but did not report any other primary features of PTSD for a DSM-IV diagnosis. Id. Dr. Laguna assigned a GAF score of 50, but opined that Hiles had no limitations related to his mental impairments. Tr. 394-95, 401.

On January 1, 2011, Francis Murphy, Ph.D. reviewed Hiles' medical records and offered an assessment of his mental residual functional capacity. Tr. 416-31. Dr. Murphy opined that Hiles was moderately limited in his ability to work in coordination with, or proximity to, others without being distracted by them, and in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Tr. 429-30.

Dr. Murphy further opined that Hiles had only mild difficulties with his activities of daily living, moderate difficulties with social functioning, and mild difficulties maintaining concentration, persistence, or pace. Tr. 426. Dr. Murphy believed that Hiles "could be expected to complete a normal workweek without exacerbation of psychological symptoms" and was capable of asking simple questions and accepting instructions. Tr. 431. Hiles retained "the ability to perform repetitive work activities without constant supervision [and had] no restrictions in his abilities in regards to understanding, memory and adaptation." Id.

On November 4, 2011, Dr. Dall submitted a mental residual functional

capacity assessment. Tr. 466-68. Dr. Dall opined that Hiles had moderate[5] limitations in his ability to: (1) understand, remember, and carry out simple instructions, (2) understand, remember, and carry out complex instructions, (3) make judgments on simple or complex work-related decisions, (4) interact appropriately with the public, co-workers, or supervisors, and (5) respond appropriately to usual work situations and to changes in a routine work setting. Tr. 466-67. Dr. Dall believed that depression and anxiety affected Hiles' ability to tolerate stress. Id. Finally, Dr. Dall stated that Hiles' attendance would "likely" be poor "due to depression in combination with other medical problems." Tr. 467.

### D.    The Administrative Hearing

On April 30, 2012, Hiles' administrative hearing was conducted. Tr. 878-922. At the hearing, Hiles testified that he had been experiencing vertigo symptoms since 1998. Tr. 893. These symptoms included dizziness, a spinning sensation, and slurred speech. Id. He further testified that an episode of vertigo would last anywhere from two weeks to two months, though he had not experienced an episode of vertigo since March 2011. Tr. 894-95. He stated that he continued to experience headaches, accompanied by nausea and vomiting, approximately three times per week. Tr. 898.

---

[5]Moderate limitations were defined as "more than a slight limitation . . . but the individual is still able to function satisfactorily." Tr. 466.

Medication was only occasionally effective in mitigating the pain, and the headaches lasted for three to four hours. Id.

Hiles also testified to difficulties relating to his PTSD. Tr. 900. He stated that he experienced flashbacks two or three times per week, lasting for up to one hour each time. Tr. 901. These flashbacks occurred during sleep, and involved cold sweats. Id. Hiles treated with a therapist once per month for depression, and took Effexor to treat his PTSD. Tr. 903. He testified that his mental impairments caused verbal aggression towards other people. Tr. 903-04. These outbursts occurred five to seven times per day and, when he had been working, he would direct these outbursts at his co-workers. Tr. 904-05.

After Hiles testified, Andrew Caporale, an impartial vocational expert, was called to give testimony. Tr. 917. The ALJ asked Mr. Caporale to assume a hypothetical individual with Hiles' age, education, and work experience who could perform sedentary work[6] that did not involve any pushing, pulling, or reaching with his upper right extremity. Tr. 919. The individual was precluded from climbing ladders, ropes, or scaffolds, or from working around moving machinery or unprotected heights due to vertigo. Id. The individual was limited

---

[6]Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §416.967.

to understanding, remembering, and carrying out simple instructions involving repetitive tasks, with "a GED of 1-1-1" learned by demonstration only. Id. Furthermore, the individual was limited to simple decision-making and exercising judgment only occasionally. Id. There could be only occasional changes in the work setting, occasional interaction with supervisors, and no interaction with co-workers or the public. Tr. 919-20.

Under this hypothetical, Mr. Caporale testified that the individual would be unable to perform Hiles' past work. Tr. 919. However, the individual would be able to perform three jobs that exist in significant numbers in the national economy: carding machine operator, table worker, or dowel inspector. Tr. 920-21. Mr. Caporale testified that an individual would be precluded from any work at the sedentary exertional level if he were off task for more than twenty percent of the day or missed two days of work per month. Tr. 921-22.


## Discussion

In an action under 42 U.S.C. §405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison

13

Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. §404.1520; Poulos v. Comm'r of

Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

## A.    The ALJ's Residual Functional Capacity Determination

Hiles challenges the ALJ's residual functional capacity determination on three distinct grounds. Hiles argues that the ALJ rejected, without explanation, part of Dr. Dall's medical opinion and failed to discuss low GAF scores. Furthermore, Hiles argues, the ALJ failed to explain vocational expert testimony that contradicted her residual functional capacity determination. Finally, Hiles contends that the ALJ failed to properly account for his vertigo and migraines.

15

### 1. Evidence Not Addressed by the ALJ

Hiles first argues that the ALJ erred in not discussing certain GAF scores or the entirety of Dr. Dall's opinion. An ALJ must consider all pertinent evidence contained within the administrative record, and must "explain his [or her] reasons for discounting" such evidence. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." Id. (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

Hiles initially argues that the ALJ "failed to offer any explanation as to why" a GAF score of 50 assigned by Dr. Laguna and a GAF score of 42 offered by a therapist were not credited. Contrary to Hiles argument, the ALJ directly addressed and dismissed both GAF scores. The ALJ assigned Dr. Laguna's GAF score "limited weight" because it was internally inconsistent with Dr. Laguna's opinion that Hiles was not limited in any way by his mental impairments and was unsupported by his "limited examination findings." Tr. 20. The ALJ also noted that the GAF score was rendered prior to Hiles' alleged onset date, and thus was not probative of his functional abilities during the relevant period. Id.

The ALJ also opined that the GAF score of 42 was "not supported by subsequent scores, which show improvement with counseling and medication

16

changes" and therefore assigned that score little weight. Id. Hiles has offered no reason why the ALJ's analysis or reasoning was flawed, and the ALJ's decision to discredit those GAF scores was supported by substantial evidence.

Hiles also argues that the ALJ rejected, without explanation, two limitations assessed by Dr. Dall. Hiles contends that the ALJ failed to explain why she rejected Dr. Dall's opinion that Hiles' ability to tolerate stress was negatively affected by his mood disorder, and her opinion that Hiles was likely to have difficulty sustaining attendance.

As an initial matter, though the ALJ did not directly address Dr. Dall's opinion that Hiles would have difficulty handling stress, a thorough reading of the ALJ's opinion reveals that she did accommodate such limitations in an adequate manner. The ALJ limited Hiles to carrying out only simple instructions, performing only repetitive tasks, and limited him to jobs that involved on occasional work setting changes. Tr. 16-17. These restrictions limit the number of changes that might occur at work, therefore reducing work-related stress.

Furthermore, the ALJ limited Hiles to only occasional decision making, and to jobs that required only occasional judgment. Tr. 16. Reducing the number of decisions that Hiles may have to make during the day further reduced any work-related stress. Finally, the ALJ limited Hiles to only occasional interaction with supervisors, and no interaction with co-workers or

the public. Tr. 17. Limiting contact with other individuals further reduces any stress that Hiles might experience, especially in light of Dr. Dall's opinion that Hiles' limitation related primarily to his mood disorder. Tr. 467. Consequently, the ALJ adequately accommodated any stress-related issues that Hiles may experience, and did not err in this respect.

Hiles also argues that the ALJ's failed to discuss any limitations in Hiles ability to consistently attend work. Dr. Dall opined that Hiles would "likely" have difficulty sustaining attendance. Tr. 467. Dr. Dall did not clarify what this meant, or how many days of work per months that Hiles was likely to miss. However, even assuming this would prevent substantially gainful employment, the ALJ did not err in failing to discuss this limitation because overwhelming evidence supports the conclusion that Hiles was not limited in his ability to consistently attend work.

First, the GAF scores that Dr. Dall assigned to Hiles never dropped below 55, indicative of only moderate symptoms or moderate difficulty with work functioning. Tr. 452, 454, 476, 757, 760, 763, 767. Moderate difficulties are inconsistent with an inability to consistently attend work. Second, though Dr. Dall did diagnose Hiles with depression, Hiles' subjective complaints related almost entirely to PTSD and situational stressors. Id. Third, at his final two appointments, Hiles was cooperative, had logical thought processes, intact thought associations, and appropriate manners. Tr. 757, 760. His insight and judgment were good, he had intact memory and intact decision

18

making capacity. Id. Hiles was able to think abstractly, had no psychomotor retardation or agitation, and no hallucinations or delusions. Tr. 475. These normal mental status findings are not indicative of any serious difficulties functioning and attending work on a day-to-day basis.

Fourth, Hiles reported improvement with medications, and improved mood along with reduced PTSD symptoms. Tr. 452, 454, 757. Furthermore, Dr. Dall opined that Hiles was able to function satisfactorily in every area of mental functioning, and the administrative record does not reveal a single missed appointment with Dr. Dall. Tr. 466-67. At his appointment with Dr. Laguna, Hiles denied any symptoms of depression. Tr. 400. Fifth, Hiles was able to attend community college two to four days per week for multiple semesters. Tr. 905-08. Hiles testified that he missed five classes total; two absences were due to migraines, two were due to shoulder pain, and one was due to a sinus infection. Tr. 915-16. None of Hiles' absences were caused by depression, the primary reason why Dr. Dall opined that he would be unable to attend work on a consistent basis.[7] Finally, two physicians, including one

---

[7]To the extent that Dr. Dall based her opinion on Hiles' physical impairments, this area of medicine is outside of Dr. Dall's expertise. Dr. Dall had no knowledge of Hiles' physical impairments beyond what he reported, and thus she could not provide an accurate assessment of any limitations related to his physical impairments. Furthermore, Hiles absences from school were related primarily to shoulder pain and migraines, both of which were largely resolved through surgery or medication. Tr. 18, 19.

examining physician, opined that Hiles would have no issues with work attendance. Tr. 395, 429.

Consequently, though the ALJ did not directly address Dr. Dall's conclusory opinion that Hiles would "likely" have difficulty sustaining attendance at work, overwhelming evidence supported the conclusion that Hiles was not limited in that way. Therefore, the ALJ did not err in failing to address this opinion. See, Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008) (holding that an ALJ may reject a treating physician's opinion outright without discussion where "[o]verwhelming evidence in the record discount[s] its probative value").

### 2. Vocational Expert Testimony

Hiles next argues that the ALJ erred by failing to account for the vocational expert's testimony that an individual who was off task for twenty percent of the day or missed more than two days of work per month would not be able to sustain substantially gainful employment.

An ALJ need only account for "a claimant's *credibly established limitations*" when relying upon vocational expert testimony. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). An ALJ need not accept the testimony of a vocational expert where that testimony was based upon limitations or symptoms that the ALJ has deemed non-credible. See, Craigie v. Bowen, 835 F.2d 56, 57-58 (3d Cir. 1987). Here, the

20

ALJ relied upon the vocational expert's testimony in response to Hiles' credibly established residual functional capacity. Tr. 22. The ALJ properly rejected the limitations related to Hiles' attendance or ability to stay on task, and consequently did not err in failing to accept the vocational expert's testimony in that respect.

### 3. Vertigo and Migraines

Hiles next argues that the ALJ's analysis of his migraine headaches was flawed. In her Opinion, the ALJ noted that Hiles was not prescribed any abortive medication for his headaches until August 2011, and did not complain of ongoing symptoms at any point after that. Tr. 19. In that vein, Hiles returned to his treating physician in October 2011 without any complaints of headaches. Tr. 448-50. In December 2011, Hiles reported to Hershey Medical Center with complaints of right shoulder pain, but did not mention any migraine symptoms. Tr. 618-19. At a follow-up appointment in March 2012, Hiles again did not mention any migraine symptoms. Tr. 720. After August 2011, the medical records do not contain a single complaint of ongoing migraine symptoms. Consequently, the ALJ accurately conveyed all evidence relating to Hiles' migraine headaches.

In contrast, the ALJ's analysis of Hiles' vertigo was decidedly inaccurate. The ALJ asserted that "treatment notes show that [Hiles'] benign vertigo was resolved after ear tube placement in October 2009." Tr. 19. While

medical records did show that Hiles' vertigo was initially resolved after the ear tube placement surgery, Tr. 329, subsequent medical records clarified that this relief was short-lived. Tr. 372. In December 2009, Hiles reported that the surgery had resolved his vertigo symptoms for only four to five days. Id. He continued complaining of vertigo symptoms through March 2011, and continued seeking treatment for vertigo through October 2011. Tr. 448-50, 601.

However, despite mischaracterizing the evidence related to Hiles' vertigo, the ALJ not only found that vertigo was a severe impairment, but also adequately accounted for any limitations relating to this impairment. Tr. 14, 16, 919. The ALJ's residual functional capacity determination prohibited the use of ladders, rope or scaffolds, and prohibited working with moving machinery or unprotected heights. Tr. 16. These limitations were put in place specifically to address Hiles' vertigo. Tr. 919. Additionally, the ALJ limited Hiles to sedentary work, an exertional level that involves sitting for most of the day, thereby limiting any issues relating to Hiles' vertigo. See, SSR 83-10 (stating that sedentary work generally requires that a claimant sit for approximately six hours during an eight hour workday). These restrictions adequately accounted for any limitations that Hiles may experience due to vertigo. Therefore, there is no indication that the ALJ's error affected the outcome of her decision, and remand is not required. Rutherford, 399 F.3d at 553.

### B.     Evaluation of the Opinion Evidence

Hiles further argues that the ALJ erroneously gave significant weight to the opinion of Dr. Murphy, an non-treating, non-examining physician. Hiles elaborates that Dr. Murphy did not have access to the treatment records of Dr. Dall, and therefore his opinion was not based upon the record as a whole.

Though Dr. Murphy rendered his decision prior to Hiles receiving treatment from Dr. Dall, this fact does not necessarily render Dr. Murphy's medical opinion outdated or irrelevant. Because "state agency review precedes ALJ review, there is always some time lapse between [a] consultant's report and the ALJ hearing and decision." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2012). Consequently, a consultant's opinion is only rendered outdated when, in the ALJ's opinion, subsequent medical records would have altered the consultant's opinion. Id. (quoting SSR 96-6p).

Although Dr. Murphy did not have access to Dr. Dall's treatment records, these records did not render Dr. Murphy's opinion outdated. Dr. Murphy had access to the medical records provided by Hiles' treating physicians at Myerstown Family Clinic, which provided a longitudinal view of Hiles' PTSD and major depressive disorder. Tr. 307-345, 438-43. Dr. Murphy also had access to Dr. Laguna's consultative report, which contained a thorough review of Hiles' mental status and included a diagnosis of personality disorder, and a GAF score of 50. Tr. 394-402.

Furthermore, Dr. Dall's treatment records do not contain information that contradicts these earlier records. Similar to the records from Myerstown Family Clinic, Dr. Dall's records document persistent complaints of difficulty with depression and PTSD, with somewhat variable moods. Tr. 452-55, 474-76, 757-68. Dr. Dall assigned GAF scores ranging from 55 to 57, which were generally less severe than the GAF scores that Dr. Murphy had access to. Tr. 392, 401, 452, 454, 476, 757, 760, 763, 765, 767. Dr. Dall's mental status examination findings were consistently normal. Tr. 452-55, 474-76, 757-68. Additionally, Dr. Dall's treatment notes demonstrate a general improvement in Hiles' symptoms, not a deterioration. Id. Consequently, Dr. Dall's records would not have altered Dr. Murphy's opinion, and therefore Dr. Murphy's opinion was not rendered outdated. Thus, the ALJ did not err in giving significant weight to Dr. Murphy's opinion.[8]

## C.    Step Three

Lastly, Hiles argues that the ALJ erred in finding that he did not meet or equal listings 12.04 or 12.06. Specifically, Hiles asserts that he had marked

---

[8]Hiles also argues that the ALJ erred by rejecting the opinions of the physicians at Myerstown Family Clinic without providing any explanation. However, these treatment records do not contain any medical opinions. See, 20 C.F.R.§404.1527 (stating that medical opinions are records from physicians "that reflect judgments about the natures and severity" of the claimant's impairments). The ALJ adequately addressed the content of these records, and was not required to explicitly adopted or reject the records because they did not constitute a medical opinion. Tr. 18.

difficulties with social functioning and marked difficulties maintaining concentration, persistence, or pace.

To be considered disabled at step three, an impairment or combination of impairments must meet or medically equal an impairments listed in the Social Security Administration's regulations. Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (emphasis in original).

In order to meet listings 12.04 or 12.06, the claimant must establish, *inter alia*, that he or she suffers from an affective or anxiety disorder that causes at least two of the following "paragraph B" criteria: (1) marked restrictions in activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt.P, App. 1 §§12.04, 12.06.

Regarding Hiles' concentration, persistence, or pace, substantial evidence supports the ALJ's conclusion that he had only mild difficulties. Tr. 16. Dr. Murphy, a physician whose opinion the ALJ gave "significant weight," opined that Hiles was only mildly limited in this area. Tr. 426. Dr. Dall, Hiles' treating physician, noted that he had normal concentration. Tr. 758, 761. After

examining Hiles, Dr. Laguna opined that, despite Hiles' complaints of poor memory and concentration, his memory was intact, and his concentration was not impaired in any way. Tr. 394-95, 400.

Regarding social functioning, no physician ever opined that Hiles was markedly limited in this area. Dr. Dall opined that Hiles was only moderately limited in his ability to interact with other individuals. Tr. 467. Dr. Murphy opined that Hiles had only moderate difficulties in social functioning. Tr. 426. Dr. Laguna, an examining physician, opined that Hiles was not limited in any way. Tr. 394-695. Consequently, substantial evidence supports the ALJ's conclusion at step three that Hiles had less than marked difficulties with social functioning and concentration, persistence, or pace.

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Pursuant to 42 U.S.C. §405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: November 7, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1798-01.wpd